UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

LOTUS FOODS BOSTON, LLC,        *
                                    *

    Plaintiff,                *
                                    *

    v.                      *        Civil Action No. 1:24-cv-10407-IT
                                    *

GO FRESH 365, INC. and LONG DENG,  *
                                    *

    Defendants.             *

MEMORANDUM & ORDER

April 1, 2026

TALWANI, D.J.

Pending before the court is Defendants Go Fresh 365, Inc. ("Go Fresh") and Long Deng's

Motion for Summary Judgment [Doc. No. 32]. Defendants contend that Plaintiff Lotus Foods

Boston, LLC ("Lotus"), is unable to prove that Defendants are liable on a promissory note

executed by non-party New Ming, Inc. ("New Ming") as New Ming's successors in interest, that

Defendants have been unjustly enriched, or that they engaged in a tortious conspiracy. Lotus

opposes the motion except as to the conspiracy claim, which Lotus has withdrawn.

For the reasons stated herein, Defendants' Motion [Doc. No. 32] is GRANTED as to

Lotus's breach of contract claim, GRANTED as to Lotus's claims against Deng in his individual

capacity, and DENIED as to Lotus's unjust enrichment claim.

## I.      Factual Record Viewed in the Light Most Favorable to Plaintiff

A.    *Defendant Long Deng and His Corporate Entities Prior to 2023*

Prior to March 2023, Defendant Deng was the chief executive officer and a shareholder

of iFresh, Inc. ("iFresh"), a publicly traded company. iFresh owned 100% of the stock of NYM

Holdings, Inc. ("NYMH"), which, in turn, wholly owned Ming's Supermarket Inc. ("Ming's").

Ming's leases property on Washington Street in Boston, Massachusetts (the "Leasehold"), where, prior to 2020, it operated a supermarket.

        B.      *Management Contract Agreement Between Ming's and New Ming Inc.*

On March 1, 2020, Ming's entered into a "Management Contract Agreement" ("MCA") with New Ming, a separate entity incorporated by several former employees of Ming's.[1]

Under the MCA, Ming's "contract[ed]" the use of the Leasehold, two adjacent parking lots, and a nearby warehouse to New Ming. Aff. of Counsel as to Matters of Record ("Hughes Aff.") Ex. B, MCA 1 [Doc. No. 35-2]. New Ming was "allowed to continue to operate the existing supermarket and prepared food business in the contracted area." Id. at 2. To facilitate the operation of the supermarket, Ming's permitted New Ming "to use all existing equipment in the supermarket[]" and Ming's existing "business license or food permits[.]" Id. at 4, 7. The MCA had a four year term, running from March 1, 2020, to February 28, 2024, and a renewal option. Id. at 2.

The parties agreed that Ming's would "not bear any costs related to the business[,]" as "[a]ll expenses [were to] be borne by [New Ming]." Id. at 4. New Ming also agreed to pay a $400,000 advance to Ming's for the first ten months of the contract, followed by a quarterly "contract fee" of $120,000. Id. at 2–3. The MCA's "Payment Agreement" section, which

---

[1] New Ming's May 2023 bankruptcy filings, discussed in greater detail infra, list the following individuals as "officers, directors, managing members, general partners, members in control, controlling shareholders, or other people in control of [New Ming] at the time of the filing of the [bankruptcy] case": Mingzhe Zhang, president, director, and owner of 35% of the company; Pengda Zheng, owner of 8%; Gezhong Yu, owner of 30%; Silong Huang, owner of 15%; and Xian Wu Huang, owner of 12%. Pl.'s Resp. SUMF, Ex. 3, New Ming Chap. 7 Bankr. Filing ECF 52 ("Chap. 7 Filing") [Doc. No. 38-3].

reflected the balance owed by New Ming to Ming's upon commencement of the MCA, included the following language:

> In case [New Ming] refuse[s] to pay above balance due, nor [sic] pay before the due date, [Ming's] has their right to regain access back to the premises, [a]ll assets and inventory in the store will be forfeit. In addition, [Ming's] has [the] right to shut down the premises without [New Ming's] consent.

Id. at 14. As to the first payment due to Ming's, New Ming owed $270,000, or the sum of the $400,000 advance and $91,782.55 in preexisting liabilities,[2] less a $1,782.55 "discount" and $220,000 of inventory. Id.

Ming's reserved the right to "unilaterally cancel the contract" if New Ming violated any "relevant regulations and laws" or did not "compl[y] with certain agreements (5 days after getting the written notice)[.]" Id. at 7. As part of the MCA, Ming's and New Ming also executed a Guaranty of Lease. Id. at 11; see id. at 6 (confirming New Ming "[saw] and understood the lease agreement between [Ming's] and the supermarket landlords (the 'main lease')" and agreed that "[v]iolation of any terms of the main lease is also equal to a breach of [the MCA]"). In relevant part, the Guaranty provided:

> This Guaranty shall be absolute and [Ming's] shall not be required to take any proceedings against [New Ming], or give any notice to the undersigned before [Ming's] has the right to demand payment of performance by the undersigned upon default by [New Ming]. This Guaranty and the liability of the undersigned hereunder shall in no way be impaired or affected by any assignment which may be made of said Lease, or any subletting [thereunder] or by any extension[s] of the payment of any rental or any other sums provided to be paid by [New Ming], or by any forbearance or delay in enforcing any of the terms, conditions, covenants or provisions of said Contract.

Id. at 11.

---

[2] The precise nature of these liabilities is unclear, as the amount is traceable to an invoice issued by Ming's to New Ming on February 1, 2020—one month prior to the date on which Ming's and New Ming signed the MCA. See id. at 10, 14.

3

New Ming breached its obligations under the MCA shortly after the MCA became effective. Ming's and New Ming entered into a Settlement Agreement on March 26, 2021, pursuant to which New Ming agreed to pay Ming's $169,616.49, plus $16,000 in legal costs, "in full settlement of the Existing Defaults, the Termination Notice," and a civil action filed by Ming's against New Ming in Suffolk County Superior Court. See Hughes Aff., Ex. J, Settlement Agreement 1–3, 11 [Doc. No. 35-10].

C.    *New Ming and Lotus*

On August 3, 2021, New Ming and Plaintiff Lotus Foods Boston, Inc. ("Lotus") entered into a Commercial Loan Agreement (the "Lotus CLA"), a Security Agreement (the "Lotus Security Agreement"), a Promissory Note, and a Management Agreement.

Pursuant to the Lotus CLA, Lotus issued a $600,000 promissory note to New Ming (the "Lotus Loan"). In the Lotus CLA, New Ming affirmed, inter alia, that it would "use the proceeds of the [Lotus Loan] to continue [New Ming's] business operations[.]" Hughes Aff., Ex. K, Lotus CLA ¶ 3(a) [Doc. No. 35-11].

New Ming agreed to repay the Lotus Loan in $2,500 monthly installments, with any outstanding principal and accrued interest due in full on February 28, 2024. Id. ¶ 3(c). As collateral for the Lotus Loan, New Ming granted Lotus a security interest in the following property (the "Collateral"):

(a) All tangible and intangible personal property, furniture, fixtures, appliances, equipment and machinery now owned or hereafter acquired by [New Ming], and the proceeds and products of such tangible personal property, furniture, fixtures, equipment, and appliances;

(b) All inventory of [New Ming], include [sic] but not limited to all goods, whether perishable or not, food, products, and other items;

(c) All additions or accessions to, or replacements of, the foregoing;

4

(d) All proceeds of the foregoing, including, but not limited to, insurance proceeds, and all proceeds of proceeds;

(e) All cash, checking accounts, savings accounts, all other financial accounts of any nature, chattel paper, notes, loans, judgments, receivables, or similar items; and

(f) All assets of [New Ming], whether stated above or otherwise.

Hughes Aff. Ex. L, Lotus Sec. Agreement ¶ 2 [Doc. No. 35-12].

New Ming affirmed that, excluding the security interest granted to Lotus by the Lotus Security Agreement, it "ha[d], or on acquisition [would] have, full title to the Collateral free from any lien, security interest, encumbrance, or claim"; "[n]o other security agreement ha[d] been made and no [other] security interest . . . ha[d] attached or ha[d] been perfected in the Collateral or in any party of the Collateral"; the Collateral would "remain in [New Ming's] possession or control at all times, at [New Ming's] risk of loss"; and, without Lotus's prior written consent, New Ming would not "sell, lease, assign, encumber, transfer, or dispose of the Collateral or the proceeds from the Collateral[,]" other than "in the ordinary course of [New Ming's] business." Id. ¶¶ 4–5, 9(a), 10(a). If New Ming defaulted on any of its obligations regarding the Lotus Loan, see id. ¶ 24, Lotus, in relevant part, retained the right to declare New Ming's debt "immediately due and payable and . . . proceed to enforce payment of the secured obligations" and "remove the Collateral from the premises of [New Ming.]" Id. ¶¶ 25(a)–(b).

On October 8, 2021, Lotus filed a Uniform Commercial Code Financing Statement (a "Form UCC-1") with Massachusetts' Office of the Secretary of the Commonwealth, thereby recording the executed Lotus Security Agreement. In the Form UCC-1, Lotus is listed as the secured party, New Ming as the debtor, and the Collateral as follows:

All assets of the Debtor, including but not limited to, all tangible and intangible personal property of New Ming, Inc. (the "Debtor"), including without limitation all presently existing and hereafter arising accounts, contract rights and all other

5

forms of obligations owing to Debtor, all proceeds thereof, including, but not limited to, all equipment, inventory, money and deposit accounts and other tangible and intangible property of Debtor resulting from the sale or disposition of such collateral and all proceeds of insurance, all guaranties and any security therefor, and all books and records relating to any of the foregoing; all of Debtor's inventory now existing or hereafter created or acquired and wherever located, leased or furnished or held by Debtor for sale, all raw materials, components, supplies and materials used, produced or consumed in Debtor's business as now or hereafter conducted; all of Debtor's equipment, office equipment, furniture, furnishings, trade fixtures, tools, parts, accessories and attachments, wherever located, whether now owned or hereafter created or acquired, and all replacements, substitutes, accessories, additions and improvements to any of the foregoing; and all registered and unregistered trademarks, service marks, trade names, copyrights, logos and other insignias and licenses now or hereafter owned by or licensed to Debtor.

Pl.'s Resp. SUMF, Ex. 4, Form UCC-1 [Doc. No. 38-4].

> D.    *New Ming Defaults on the Lotus Security Agreement, and Lotus Obtains a Judgment Against New Ming*

On February 25, 2022, Lotus sent a letter to New Ming's counsel (the "Lotus Default Letter"), in which Lotus "declar[ed] an Event of Default and accelerat[ed] the entire indebtedness owed to [Lotus] by [New Ming]." Hughes Aff. Ex. O, Lotus Default Letter 1 [Doc. No. 35-15]. As grounds, Lotus asserted that New Ming had failed to make required payments to Lotus, "transferr[ed] credit card payments to an unrelated entity to avoid [Lotus's] security interest, interfere[d] in the management of the business, harass[ed] employees of the company and . . . effective[ly] ouster[ed]" Lotus. Id. Lotus also declared its intent to take possession of the collateral subject to the Lotus Security Agreement, warning New Ming that Lotus

> ha[d] a security interest in all assets of New Ming, Inc., and d[id] not consent to the use or disposition of those asserts absent payment in full of the loan obligation or other written agreement between the parties. Furthermore, efforts to transfer the collateral as previously done by some of the shareholders of New Ming, Inc. to a new entity w[ould] be pursued to the fullest extent of the law[.]

Id.

On March 4, 2022, Lotus filed a Complaint in Confession of Judgment against New Ming in the Court of Common Pleas of Allegheny County, Pennsylvania. Lotus ultimately obtained a judgment on confession from that court.[3]

E.      *New Ming Defaults on the MCA Agreement*

On March 8, 2022, four days after Lotus obtained a judgment against New Ming, Ming's sent New Ming a Notice of Default (the "Ming's Notice of Default"), asserting New Ming's failure to pay both a $120,000 quarterly management fee owed to Ming's and the required rent for the Leasehold, adjacent parking lots, and warehouse covered under the MCA. Ming's instructed New Ming that, should New Ming fail to pay the outstanding management fee and cure the rent non-payments "promptly[,]" Ming's would terminate the MCA and "exercise its rights and remedies thereunder, including but not limited to taking back possession of the [Leasehold] and filing suit against New Ming and the Guarantors" to recover damages. See Hughes Aff. Ex. T, Ming's Notice of Default ECF 3 [Doc. No. 35-20].

On March 22, 2022, Ming's terminated the MCA. Ming's demanded, in relevant part, that New Ming "immediately cease any and all management operations at the [s]upermarket . . . and immediately contact [Ming's attorney] to coordinate the turnover of all management functions, key and entry codes, and any and all records related to the management" of the

---

[3] Under the terms of the Lotus CLA [Doc. No. 35-11], New Ming "specifically waive[d] all rights [it] ha[d] or may have [had] to notice and an opportunity for a hearing prior to execution upon any judgment entered against [Lotus] pursuant to the terms hereof" and

> irrevocably authorize[d] . . . any attorney . . . to appear for [New Ming] in any [Pennsylvania court], and with or without a complaint or declaration filed, and therein to enter and confess judgment against borrower in favor of lender . . . for the entire amount due to lender upon such default or event of default as provided herein[.]

Id. ¶ 9.

supermarket, adjacent parking lots, and warehouse. See Hughes Aff., Ex. U, Ming's Termination Notice ECF 3 [Doc. No. 35-21].

      F.     *Further Litigation with New Ming*

Lotus and Ming's separate proceedings against New Ming continued on roughly parallel tracks:

On March 24, 2022, Lotus filed suit in the Suffolk County Superior Court (the "Lotus-New Ming Suit"), seeking enforcement of the judgment obtained by Lotus against New Ming in the Court of Common Pleas of Allegheny County. Hughes Aff. Ex. Q, Compl., Lotus Foods Boston, LLC v. New Ming, Inc., No. 2284CV00643 [Doc. No. 35-17].

On April 14, 2022, Ming's filed suit against New Ming in the Suffolk County Superior Court (the "Ming's-New Ming Suit"), seeking damages for breach of contract and an injunction barring New Ming from continuing its management operations at the supermarket. See Hughes Aff., Ex. V, [Doc. No. 35-22] (Complaint in Ming's Supermarket, Inc. v. New Ming Inc., No. 2284CV00823).

On April 15, 2022, a Superior Court judge denied New Ming's emergency motion to stay the Lotus-New Ming Suit and, inter alia, prohibited New Ming from "dissipat[ing]" any cash or funds held in its identified accounts, ordered New Ming to provide Lotus's counsel various financial records, and mandated that New Ming send Lotus's counsel a weekly accounting "of the ordinary course of business expenses" incurred during the pendency of the litigation. Hughes Aff. Ex. R, Order, Lotus Foods Boston, LLC v. New Ming, Inc., No. 2284CV00643, at ECF 1, 1 ¶ 1, 2 ¶ 5, 3 ¶ 8 [Doc. No. 35-18]. Where New Ming "d[id] not currently have a system in place tracking inventory[,]" the court instructed New Ming to "allow Lotus Foods to enter the store to look at inventory" or, if New Ming established an inventory tracking system while the case was ongoing, "provide weekly inventory reports" to Lotus. Id. at ECF 4 ¶ 7.

Roughly one month later, on May 9, 2022, in the Ming's-New Ming Suit, a Superior Court judge granted a preliminary injunction against New Ming, to take effect June 9, 2022. Hughes Aff. Ex. W, Prelim. Injunc., Ming's Supermarket, Inc. v. New Ming Inc., No. 2284CV00823 [Doc. No. 35-23]. The injunction restrained New Ming "from continuing to manage and operate the supermarket" and ordered New Ming to "turn over all management functions, key and entry codes, and any and all records related thereto to [Ming's] and to not interfere with [Ming's] resumption of direct management of the business." Id.

G.     NYMH's Receivership and Defendant Go Fresh's Purchase

On May 31, 2022, the United States Securities and Exchange Commission ("SEC") filed a complaint (the "SEC suit") against iFresh and Deng, alleging violations of Section 10(b) of the Exchange Act and Rule 10b-5; Section 17(a) of the Securities Act; Section 13(a) of the Exchange Act and Rules 12b-20 and 13a-1; and Section 13(b)(2)(A) and (B) of the Exchange Act.

Separately, in August 2022, a creditor initiated proceedings in the United States District Court for the District of Delaware for breach of contract and the appointment of a receiver after NYMH failed to repay various credit facilities, for which iFresh and its subsidiaries served as guarantors. On August 31, 2022, the District Court placed iFresh and its subsidiaries, including NYMH and Ming's, into a receivership (the "Receivership").

On March 8, 2023, the District Court approved the private sale of all of NYMH's stock to Defendant Go Fresh. See Hughes Aff. Ex. BB, Ord. Granting Receiver's Mot. Pursuant to 28 U.S.C. § 2004 for Entry of Ord. Authorizing (I) the Private Sale of the Stock of NYM Hld'g, Inc., (II) the Waiver of Requirements of 28 U.S.C. §§ 2001 and 2004, and (III) the Dismissal of Receivership Case Upon Closing of Sale 4–5, 9 ("Receivership Sale Ord.") [Doc. No. 35-28].

Following the sale, the Receivership was dismissed on March 30, 2023. See Hughes Aff. Ex. CC, Receivership Civ. Dkt. ECF 12 [Doc. No. 35-29].

Accordingly, as of March 8, 2023, the relevant ownership and corporate structure was as follows: (1) Deng owns 100% of the stock of Go Fresh and is its president; (2) Go Fresh owns 100% of the stock of NYMH; and (3) NYMH owns 100% of the stock of Ming's.

H.    *Ming's Takes Over the Supermarket*

On or around April 15, 2023, after Go Fresh's purchase of NYMH and its subsidiaries, including Ming's, Ming's entered the Leasehold and took over the operations and management of the supermarket. To effect these changes, Ming's brought in new managers for the supermarket, hired approximately twenty-four new employees, and retained some of New Ming's former employees.

On April 15 or April 16, 2023, upon Ming's taking of the Leasehold and operation of the supermarket, employees from both New Ming and Ming's surveyed the food item inventory in the supermarket. To facilitate the inventory survey, the supermarket closed for a "a day or half a day." Pl.'s Resp. SUMF, Ex. 8, Long Deng Dep. 18:6–19:9 [Doc. No. 38-8]. Ming's retained the inventory and the on-site cash.

Ming's continues to manage and operate the supermarket at the Leasehold.

I.    *Deng Settles the SEC Suit*

On May 23, 2023, Deng consented to entry of judgment against him without admitting or denying the allegations in the SEC suit. See Pl.'s Resp. SUMF, Ex. 7, U.S. Sec. & Exch. Comm'n v. iFresh et al, J. as to Def. Long Deng ECF 1 [Doc. No. 38-7]. Pursuant to the terms of the judgment, Deng agreed to pay $134,706 in profit disgorgement, prejudgment interest, and a statutory penalty. See id. at ECF 5 ¶ VI, 7 ¶ VII. He also agreed to a five-year bar on "acting as an officer or director of any issuer that has a class of securities registered pursuant to Section 12

of the Exchange Act . . . or that is required to file reports pursuant to Section 15(d) of the Exchange Act[.]" Id. at ECF 4 ¶ V.

J.    *New Ming's Bankruptcy Proceedings*

On May 24, 2023, after Ming's had taken control of the store and the inventory, New Ming filed a petition for Chapter 7 bankruptcy in the U.S. Bankruptcy Court for the District of Massachusetts.

In its filed Bankruptcy Schedules, New Ming identified "[$]10,000 + (TBD)" in Accounts Receivable, which it described as "cash of New Ming Inc. in possession of Ming's Supermarket Inc." Chap. 7 Filing ECF 10 [Doc. No. 38-3]. New Ming also listed grocery inventory, valued at $750,000 as of April 15, 2023, as one of its assets. Id. at ECF 11. Where the Bankruptcy Schedules called for information regarding "any inventories of the debtor's property [that had] been taken within [two] years before filing th[e] case[,]" New Ming represented that Ming's "supervised the taking of" $700,000 of inventory on April 15, 2023, and is in "possession of [the] inventory records." Id. at ECF 51–52.

As for its outstanding liabilities, New Ming enumerated various debts totaling $3,932,091.76, including the $600,000 promissory note owed to Lotus. Id. at ECF 22, 35. When asked if "any creditors ha[d] claims secured by [New Ming's] property[,]" New Ming answered in the negative. Id. at ECF 17.

On May 26, 2023, New Ming filed a Notice and Suggestion of Bankruptcy in the Lotus-New Ming Suit, thereby staying the matter. Over a year later, New Ming filed a notice to stay the Ming's-New Ming Suit.

II.    **Procedural Background**

In their Motion for Summary Judgment [Doc. No. 32], Defendants seek summary judgment on all counts. Lotus opposes the motion as to the breach of contract and unjust

11

enrichment claims but has withdrawn its civil conspiracy claim. See Elec. Clerk's Notes [Doc. No. 50].[4]

### III.    Standard of Review

Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is material when, under the governing substantive law, it could affect the outcome of the case. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); Baker v. St. Paul Travelers, Inc., 670 F.3d 119, 125 (1st Cir. 2012). A dispute is genuine if a reasonable jury could return a verdict for the non-moving party. Anderson, 477 U.S. at 248.

The moving party bears the initial burden of establishing the absence of a genuine dispute of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). This burden can be satisfied in two ways: (1) by submitting affirmative evidence that negates an essential element of the non-moving party's claim or (2) by demonstrating that the non-moving party failed to establish an essential element of its claim. Id. at 331.

Once the moving party establishes the absence of a genuine dispute of material fact, the burden shifts to the non-moving party to set forth facts demonstrating that a genuine dispute of material fact remains. Id. at 321. The non-moving party cannot oppose a properly supported summary judgment motion by "rest[ing] on mere allegations or denials of [the] pleadings." Anderson, 477 U.S. at 248. Rather, the non-moving party must "go beyond the pleadings and by

---

[4] Lotus styled its opposition as a Response to Defendants' Motion for Summary Judgment and Plaintiff's Cross Motion for Summary Judgment ("Response") [Doc. No. 37]. The court denied Lotus's cross-motion without prejudice where Lotus did not file the motion in accordance with the requirements of Local Rule 56.1. See Elec. Clerk's Notes [Doc. No. 50].

[his or] her own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." Celotex, 477 U.S. at 324 (quotations omitted). Disputes over facts "that are irrelevant or unnecessary" will not preclude summary judgment. Anderson, 477 U.S. at 248.

When reviewing a motion for summary judgment, the court must take all properly supported evidence in the light most favorable to the non-movant and draw all reasonable inferences in the non-movant's favor. Griggs-Ryan v. Smith, 904 F.2d 112, 115 (1st Cir. 1990). "Credibility determinations, the weighing of evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge . . . ruling on a motion for summary judgment." Anderson, 477 U.S. at 255.

## IV.    Discussion

Based on the summary judgment record, a reasonable jury could find that, in the spring of 2023, Ming's entered the store, took over the operations of the store, and took control of all assets of the store. Opp'n 2 [Doc. No. 39]. With all reasonable inferences resolved in Lotus's favor, Lotus can also show that Go Fresh, which became the sole owner of NYMH prior to the 2023 takeover of the supermarket at issue here, is liable for the obligations of its wholly owned subsidiaries.

Defendants argue that they nonetheless are entitled to summary judgment where Lotus has failed to muster evidence in support of any claims against Deng in an individual capacity; cannot establish that Defendants are "successors-in-interest" to New Ming under either a de facto merger theory or a mere continuation theory; and Lotus's unjust enrichment claim is barred where there is an available remedy at law and where Lotus "has not alleged that [it] conferred any benefit upon the Defendants." Mem. ISO Mot. for Summ. J. 17–18, 23–24 [Doc. No. 36].

The court addresses each of these arguments in turn.

A. *Deng's Individual Liability*

In naming Deng as a defendant in his individual capacity, see Compl. ¶¶ 3–4 [Doc. No. 1]; Opp'n 8–9 [Doc. No. 39], Lotus asks this court to "pierce the corporate veil" between Deng and his corporate entities and their subsidiaries.

Although a corporation's principal is typically not liable for the corporation's acts, "[t]his general rule . . . gives way when circumstances arise that provide an occasion to look beyond the corporate form for the purpose of defeating fraud or wrong, or for the remedying of injuries." Kraft Power Corp. v. Merrill, 464 Mass. 145, 148, 981 N.E.2d 671, 677–78 (2013). Under such circumstances, "the corporate veil can be pierced, as a tool of equity, to disregard the corporation's existence and impose liability on individual principals." Id. (citing United States v. Bestfoods, 524 U.S. 51, 64 (1998)). As a general matter, "Massachusetts has been somewhat more strict than other jurisdictions in respecting the separate entities of different corporations." Birbara v. Locke, 99 F.3d 1233, 1238 (1st Cir. 1996) (quotation omitted).

Under Massachusetts law, a court's decision as to whether the corporate veil should be pierced is guided by the standard set forth in My Bread Baking Co. v. Cumberland Farms, Inc., 353 Mass. 614, 233 N.E.2d 748 (1968) ("My Bread"). See Birbara, 99 F.3d at 1240 ("My Bread sets the standard for deciding when to pierce the corporate veil under Massachusetts law."). In My Bread, the Massachusetts Supreme Judicial Court articulated that, where there is also common stock ownership and common management among the entities, disregarding the corporate form may be appropriate

> (a) when there is active and direct participation by the representatives of one corporation, apparently exercising some form of pervasive control, in the activities of another and there is some fraudulent or injurious consequence of the intercorporate relationship, or (b) when there is a confused intermingling of activity of two or more corporations engaged in a common enterprise with substantial disregard of the separate nature of the corporate entities or serious ambiguity about

the manner and capacity in which the various corporations and their respective representatives are acting.

353 Mass. at 619, 233 N.E.2d at 752.

In Pepsi-Cola Metropolitan Bottling Co., Inc. v. Checkers, 754 F.2d 10 (1st Cir. 1985) ("Pepsi-Cola"), the First Circuit "elucidate[d] some factors that may be considered when engaging in a My Bread analysis." Birbara, 99 F.3d at 1240. Such factors include

insufficient capitalization for purposes of the corporate undertaking, nonobservance of corporate formalities, nonpayment of dividends, insolvency of the corporation at the time of the litigated transaction, siphoning of corporate funds by the dominant shareholders, nonfunctioning of officers and directors other than the shareholders, absence of corporate records, use of the corporation for transactions of the dominant shareholders, and use of the corporation in promoting fraud.

Pepsi-Cola, 754 F.2d at 16; see Platten v. HG Bermuda Exempted Ltd., 437 F.3d 118, 128 (2006) (citing the Pepsi-Cola factors). The Massachusetts Supreme Judicial Court has since recognized the Pepsi-Cola factors. See Lipsitt v. Plaud, 466 Mass. 240, 253, 994 N.E.2d 777, 788 (2013) (noting that the Supreme Judicial Court "recognized" these factors in Attorney General v. M.C.K., Inc., 432 Mass. 546, 555 & n.19, 736 N.E.2d 373, 380–81 & n.19 (2000)).

Under My Bread and Pepsi-Cola, Lotus has not made the requisite showing that would permit a reasonable jury to pierce through the corporate veil to reach Deng personally for any activities undertaken by Go Fresh or its wholly owned subsidiaries.

Deng is the chairman, chief executive officer, and owner of Go Fresh and the "president" of Ming's, which is itself ultimately owned by Go Fresh. There may well be further indicia of common management and ownership across Go Fresh and its subsidiaries. But, although it is necessary, "common ownership of the stock of two or more corporations together with common management" is not sufficient, to pierce the corporate veil. See My Bread, 353 Mass. at 619, 233 N.E.2d at 752.

15

In the factual record before the court, Lotus has made no specific showing as to the other factors that, when taken together with common ownership and management of Deng's corporate entities, may permit Lotus to reach Deng in his individual capacity. There is, for example, no showing that Go Fresh, NYMH, or Ming's were undercapitalized, insolvent at the time Ming's removed New Ming from the supermarket, or failed to maintain corporate records. See Pepsi-Cola, 754 F.2d at 16. There is likewise no evidence that Deng "siphon[ed]" funds from his corporate entities or their subsidiaries, brought on "nonfunctioning" officers and directors (or that officers and directors besides Deng exist), ignored specific corporate formalities or dividend obligations, or undertook transactions, legitimate or otherwise, for Deng's benefit, rather than that of his entities. See id. The overall tenor of Lotus's allegations does suggest that Deng used Go Fresh and Ming's to facilitate or "promot[e] fraud" with respect to the April 2023 taking of collateral pledged to Lotus, see id., but such a suggestion, on its own, is not sufficient to raise Lotus's proposed basis for disregarding Go Fresh's corporate form beyond the "merely colorable" level. See Anderson, 477 U.S. at 249; Irobe v. United States Dep't of Agric., 890 F.3d 371, 380–81 (1st Cir. 2018).

Accordingly, Lotus has not met its burden to sufficiently demonstrate either the requisite pervasive control between Deng and his corporate entities leading to fraud or injury; or "confused intermingling" of Deng and the entities' assets or corporate structure, in substantial disregard of the entities' separateness or "serious ambiguity" regarding the "manner and capacity" in which they entities have acted. See My Bread, 353 Mass. at 619, 233 N.E.2d at 752. Defendants' motion for summary judgment is therefore GRANTED as to the claims against Deng in his individual capacity.

B.    *Successor Liability*

"As a general rule of corporate law, the liabilities of a corporation are not imposed upon its successor." Smith v. Kelley, 484 Mass. 111, 120, 139 N.E.3d 314, 322 (2020). If, however, a corporation undergoes a "reorganization transforming a single company from one corporate entity into another . . . successor liability may be imposed if the entity remains essential the same, despite a formalistic change of name or of corporate form." Ribadeneira v. New Balance Athletics, Inc., 65 F.4th 1, 23 (1st Cir. 2023) (construing Massachusetts law) (quotations omitted).

Under Massachusetts law, a successor in interest may be held responsible for its predecessor's liabilities if:

> (1) the successor expressly or impliedly assumes liability of the predecessor, (2) the transaction is a de facto merger or consolidation, (3) the successor is a mere continuation of the predecessor, or (4) the transaction is a fraudulent effort to avoid liabilities of the predecessor.

Milliken & Co. v. Duro Textiles, LLC, 451 Mass. 547, 556, 887 N.E.2d 244, 254–55 (2008); see Smith, 484 Mass. at 120 n.10, 139 N.E.3d at 323 n.10 (same); Guzman v. MRM/Elgin, 409 Mass. 563, 566, 567 N.E.2d 929, 931 (1991). "The public policy underlying the imposition of successor liability is the fair remuneration of innocent corporate creditors." Milliken, 451 Mass. at 556, 887 N.E.2d at 255 (citing Cargill, Inc. v. Beaver Coal & Oil Co., Inc., 424 Mass. 356, 362, 676 N.E.2d 815, 820 (1997)).

In its breach of contract claim (Count I), Lotus asserts that Go Fresh is liable for breach of contract as a successor to New Ming under the "de facto merger" and "mere continuation" exceptions, as well as under an independent "continuity of enterprise" theory.

17

1.   Prerequisite Asset Transfer

"In order for a corporation to be deemed a successor corporation in the first place, it must be a successor to all, or substantially all, of another corporation's assets." Premier Cap., LLC v. KMZ, Inc., 464 Mass. 467, 475, 984 N.E.2d 286, 292 (2013) (quotation omitted). An asset transfer between the predecessor and successor entities is thus "an essential prerequisite to successor liability[.]" Id. (quoting Carreiro v. Rhodes Gill & Co., 68 F.3d 1443, 1448 (1st Cir. 1995)).

Here, the factual record before the court would permit a reasonable jury to find that New Ming transferred the inventory in the supermarket and on-site cash to Ming's on April 15, 2023. Compare, e.g., Go Fresh Interrogs. ECF 6 [Doc. No. 38-1] ("New Ming . . . did not own any of the inventory or other assets that were located at the supermarket, which were at all times assets of [Ming's.]") and Long Deng Dep. 11:23–12:16 [Doc. No. 38-8] (asserting that "Henry Zheng" signed over the supermarket's inventory to Ming's when it took over the store in April 2023), with Chap. 7 Filing ECF 11, 51–52 [Doc. No. 38-3] (indicating that New Ming owned $750,000 of inventory as of April 15, 2023, $700,000 of which was taken under Ming's "supervision"); Pengda Zheng Examination 12:3–15 [Doc. No. 38-5] (asserting that Deng "is in possession" of $10,000 that was in the supermarket on April 15, 2023); and Lotus Sec. Agreement ¶ 2 [Doc. No. 35-12] (collateral for the Lotus Loan included "all inventory of [New Ming], includ[ing] but not limited to all goods, whether perishable or not, food, products, and other items"). Excluding "office furniture, fixtures, [] equipment[,] and collectibles" valued at $10,000 and $200 in a checking account, see Chap. 7 Filing ECF 9, 12, 16 [Doc. No. 38-3], this constituted "all, or

18

substantially all, of" New Ming's accessible assets. See Premier Cap., LLC, 464 Mass. at 475, 984 N.E.2d at 292.[5]

The asset transfer requirement thus met, the court proceeds to Defendants' assertion that there is no genuine dispute of as to the existence of a predecessor-successor relationship between New Ming and the Go Fresh entities.

    2.  De Facto Merger

Although "[n]o single factor is necessary or sufficient to establish a de facto merger[,]" courts generally consider the following factors:

> [W]hether (1) there is a continuation of the enterprise of the seller corporation so that there is continuity of management, personnel, physical location, assets, and general business operations; whether (2) there is a continuity of shareholders which results from the purchasing corporation paying for the acquired assets with shares of its own stock, this stock ultimately coming to be held by the shareholders of the seller corporation so that they become a constituent part of the purchasing corporation; whether (3) the seller corporation ceases its ordinary business operations, liquidates, and dissolves as soon as legally and practically possible; and whether (4) the purchasing corporation assumes those obligations of the seller ordinarily necessary for the uninterrupted continuation of normal business operations of the seller corporation.

Cargill, 424 Mass. at 359–60, 676 N.E.2d at 818 (citing In re Acushnet River & New Bedford Harbor Proceedings re Alleged PCB Pollution, 712 F. Supp. 1010, 1015 (D. Mass. 1989)). The court addresses each of these factors as they pertain to New Ming and Defendants.

    a.      **Continuity of the Enterprise**

First, as to "continuity of management, personnel, physical location, assets, and general business operations[,]" Cargill, 424 Mass. at 359–60, 676 N.E.2d at 818, a reasonable jury could

---

[5] New Ming also identified $1,073,575 in "deposits and prepayments" in its May 2023 Bankruptcy Schedules, consisting of a $1,375 prepayment for trash removal, $70,200 in supermarket rent prepayments, and a $912,000 parking lot rent prepayment. Chap. 7 Filing ECF 9–11 [Doc. No. 38-3].

find from the factual record that New Ming's operations, assets, and some of its personnel were effectively absorbed by Ming's. But Lotus has pointed to no evidence of a continuity of "management, officers, directors, and shareholders." See Am. Paper Recycling Corp. v. IHC Corp., 707 F. Supp. 2d 114, 120 (D. Mass. 2010) ("[I]n determining whether a de facto merger has occurred, courts pay particular attention to the continuation of management, officers, directors, and shareholders." (quoting Cargill, 424 Mass. at 360, 676 N.E. 2d at 818)).

In Cargill, a case in which the successor entity was held liable for its predecessor's debt, the successor entity "simply became" the predecessor for the purposes of the continuity factor: it used the predecessor's name, "conducted the business in substantially the same fashion . . . from the same locations [and] with the same employees and operational management[,]" used the same telephone numbers and equipment, and retained the predecessor's "customer lists and contracts[.]" 424 Mass. at 360–61, 676 N.E.2d at 818–19. By contrast, in American Paper Recycling Corp., the court, applying Cargill, found that the facts of the case weighed against successor liability where the purported successor, inter alia, "did not retain key members of Ivy's management team" and had none of the same corporate officers or directors, was formed via an arms-length exchange of good and fair consideration[,]" and chose to discontinue many of the prior entity's vendor relationships and ownership of real property. Am. Paper Recycling Corp., 707 F. Supp. 2d at 120–21.

Here, there was at most a de minimis interruption in the business of the supermarket when Ming's removed New Ming on April 15, 2023. New Ming's inventory and on-site cash were transferred to Ming's, as discussed supra, and some New Ming employees were hired to continue to work at the supermarket now under Ming's control. The supermarket continued on in the same location on Washington Street and under the same name, with no more than "a day or

half a day" stoppage of store operations to permit employees from New Ming and Ming's to survey the supermarket's inventory.

As to whether there is continuity of "management, officers, [and] directors" Am. Paper Recycling Corp., 707 F. Supp. 2d at 120, the factual showing from Lotus is weaker. At the time Ming's took over the supermarket, New Ming was an entity separate from Go Fresh and its wholly owned subsidiaries, and was incorporated and operated by individuals who, based on the record before the court, were not placed in any management roles with Ming's after its April 2023 takeover. The lack of overlap between New Ming's leadership and that of Ming's is further evidenced by New Ming's bankruptcy filings, in which New Ming's shareholders and officers— none of whom are Deng, Ming's, NYMH, Go Fresh, or Deng's prior entity, iFresh—are attested to. See Chap. 7 Filing ECF 52, 54–55 [Doc. No. 38-3].

b.    Continuity of Shareholders

Continuity of shareholders "is found where the purchaser corporation exchanges its own stock as consideration exchanges its own stock as consideration for the seller corporation's assets so that the shareholders of the seller corporation become a constituent part of the purchaser corporation." Dayton v. Peck, Stow, and Wilcox Co., 739 F.2d 690, 693 (1st Cir. 1984) (applying Massachusetts law). Although the First Circuit "do[es] not understand the [Massachusetts] state law to be that continuity of shareholders is absolutely required, it remains a very weighty factor in identifying a de facto merger." DeJesus v. Park Corp., 530 Fed. App'x 3, 8 (1st Cir. 2013).

Insofar as Lotus asserts that Defendants, through Ming's, "took over the [supermarket] and began operating it without any payment to [Lotus] or other creditors[,]" Compl. ¶ 22 [Doc. No. 1], there is no basis on which to conclude that an exchange of stock took place. Massachusetts law, however, does contemplate a broader application of this factor, such that the

21

question for the court is more akin to whether there is "shareholder continuity or any alternative means of continuity of control." DeJesus, 550 Fed. App'x at 8 (emphasis added).

But, although "there is no requirement that there be complete shareholder identity between the seller and a buyer before corporate successor liability will attach[,]" Cargill, 424 Mass. at 361, 676 N.E.2d at 819, Lotus has offered no evidence that any controlling stake in New Ming, however defined, passed to Ming's, NYMH, or Go Fresh. See Goguen v. Textron, Inc., 476 F. Supp. 2d 5, 13 (D. Mass. 2007) (applying Massachusetts law sand finding continuity of shareholders factor not satisfied where defendant "paid cash for the assets of [the purported predecessor entity], and thus no shares exchanged hands"); see also Cargill, 424 Mass. at 358, 361, 676 N.E.2d at 817–19 (although not "shareholder continuity in its fullest sense[,]" that seller company's sole shareholder became director of successor company and bought 12.5% shareholder interest in successor "with the sale proceeds" sufficient for this factor).

Thus, where there is no common identity between New Ming's ownership and the ownership of Ming's, NYMH, or Go Fresh, "[t]his factor . . . cuts sharply against a finding of de facto merger." DeJesus, 530 Fed. App'x at 7.

### c.      Cessation of Predecessor's Business Operations.

The third factor for de facto merger—whether the purported predecessor "ceases its ordinary business operations, liquidates, and dissolves as soon as legally and practically possible[,]" Cargill, 424 Mass. at 360, 676 N.E.2d at 818—is satisfied here. Although Defendants contend that New Ming's "liquidation is not a proof of a de facto merger, but rather the exact opposite[,]" Mem. ISO Defs.' Mot. for Summ. J. 22 [Doc. No. 36], there is no dispute that New Ming ceased its business operations and filed a petition for Chapter 7 bankruptcy no later than May 24, 2023. Milliken, 451 Mass. at 558, 887 N.E.2d at 256 (successor liability can

attach "where a corporation eases all of its ordinary business operations, which are assumed by another corporation, and liquidates its assets").

> ### d.    Assumption of Obligations Necessary to Continue Normal Business Operations

When Ming's assumed control over the supermarket and removed New Ming in April 2023, New Ming's obligations, in relevant part, consisted of the Lotus Loan, a $400,000 promissory note owed to another party, and debts owed to service providers and food and product distributors.

Setting aside the Lotus Loan, which was not explicitly assumed by Ming's or otherwise taken on by Go Fresh, the record before the court does not speak to whether Ming's, or any other entity in the corporate structure, assumed the $400,000 promissory note or the liabilities associated with the supermarket's other suppliers and service providers. Whether this factor counsels for or against finding a de facto merger is thus unclear. See Cargill, 424 Mass. at 362, 676 N.E.2d at 819–20 (factor satisfied where successor company agreed to pay certain creditors of the predecessor and assumed the predecessor's installation contracts, service contracts, and delivery obligations); DeJesus v. Bertsch, Inc., 898 F. Supp. 2d 353, 361 (D. Mass. 2012) (factor satisfied where successor, inter alia, assumed predecessor's "backlogged purchase orders[,]" "renewed distributor contracts," and "reset and assumed . . . terms with vendors like UPS and FedEx"), aff'd sub nom. DeJesus v. Park Corp., 530 Fed. App'x 3 (1st Cir. 2013); Goguen, 476 F. Supp. 2d at 13 (factor satisfied where successor "assumed various obligations [of the predecessor,]" including "trade payables").

> ### e.    Conclusion

Where the court finds no continuity of shareholders and an inconsistent showing of the continuity of enterprise, and where one of the other two factors in the de facto merger analysis is

23

equivocal, the court concludes that Go Fresh cannot be held liable as a successor to New Ming

for the Lotus Loan under the de facto merger exception. See DeJesus, 530 Fed. App'x at 8

("Where, as here, there is no shareholder continuity or any alternative means of continuity of

control, and one of the remaining three factors is equivocal, we conclude that no such merger

occurred[.]"); Am. Paper Recycling Corp., 707 F. Supp. 2d at 121 (noting that a weak showing

for the continuity factor "weighs heavily against a de facto merger").

### 3.   Mere Continuation

To determine whether a successor entity is a "mere continuation" of its predecessor and

therefore subject to successor liability, courts "examine the continuity or discontinuity of the

ownership, officers, directors, stockholders, management, personnel, assets, and operations of

the two entities." Smith, 484 Mass. at 120–21, 139 N.E.3d at 323. No single factor is dispositive

in this fact-based inquiry, and the ultimate focus of the analysis is "whether one company has

become another for the purpose of eliminating its corporate debt." Id. (quoting Milliken, 451

Mass. at 558, 887 N.E.2d at 255–56); Milliken, 451 Mass. at 558, 887 N.E.2d at 255 ("In

essence, the purchasing corporation is merely a 'new hat' for the seller." (quotation omitted)).

In McCarthy v. Litton Industries, Inc., 410 Mass. 15, 23, 570 N.E.2d 1008, 1013 (1991),

the Massachusetts Supreme Judicial Court "reaffirm[ed] that the indices of 'continuation' are, at

a minimum: continuity of directors, officers, and stockholders; and the continued existence of

only one corporation after the sale of assets" (emphasis added). As noted supra, Lotus offers no

evidence on which a reasonable jury could conclude that there was a continuity of owners,

directors, or officers as between New Ming and Ming's, NYMH, or Go Fresh. Accordingly, the

court finds that Go Fresh cannot be held liable for the Lotus Loan under the mere continuation

exception. See id.; Dayton, 739 F.2d at 693 (purported successor entity's "purchase of

[predecessor's] assets for cash d[id] not bring this case within the 'mere continuation' exception"

24

where "[t]he key element of a continuation is a common identity of the officers, directors, and stockholders in the selling and purchasing corporations" (quotation omitted)); Goguen, 476 F. Supp. 2d at 15 ("There was no continuity of shareholders, directors, or officers [between the predecessor and purported successor company], and therefore [the mere continuation] theory is not applicable.").

4. Continuity of Enterprise

Lotus also asserts that, distinct from a de facto merger or mere continuation, there is a "continuity of enterprise between [New Ming] and Defendants' operation of the New Ming Store[,]" under which liability inures to the Defendants. Opp'n 5–6, 8 [Doc. No. 39]. As support, Lotus cites to the Massachusetts Supreme Judicial Court's opinion in Cargill, including its "positive[] cit[ation]" to Turner v. Bituminous Casualty Co., 397 Mich. 406, 406, 411, 244 N.W.2d 873, 874–75 (1976). See Opp'n 8 [Doc. No. 39].

But Lotus overreads this reference to the "continuity of enterprise" theory of successor liability. Rather than adopt or otherwise validate this theory, the Supreme Judicial Court in Cargill merely acknowledged in a footnote that "[w]here no stock is exchanged, corporate successor liability has more frequently been imposed on a theory of 'continuity of enterprise'" and cited to Turner, an out-of-state case, as one such example. 424 Mass. at 361 n.8, 676 N.E.2d at 819 n.8; see id. ("There is no claim here by [the plaintiff] that we should apply that theory of liability and we do not do so."). Later, in McCarthy, a product liability case, the Supreme Judicial Court acknowledged that "[a] few courts" had adopted the "continuity of enterprise" theory but did not itself adopt it. 410 Mass. at 22, 570 N.E.2d at 1013; see DeJesus, 530 Fed. App'x 3 at 7 ("Massachusetts courts have suggested that they would not adopt a related, independent exception embraced by other jurisdictions, that of 'continuity of enterprise.'"); Nat'l Gypsum Co. v. Continental Brands Corp., 895 F. Supp. 328, 340 (D. Mass. 1995)

25

("[W]hile [the Massachusetts Supreme Judicial Court] has not directly addressed the less radical 'enterprise' theory of Turner . . . there is no indication that it would adopt any theory justifying successor liability without fault."). Therefore, where Lotus has not demonstrated that "continuity of enterprise" is relevant to this dispute under Massachusetts law, the court does not further address the argument.

In light of the preceding analysis, Defendants' motion for summary judgment on Lotus's breach of contract claim is GRANTED.

C.    *Lotus's Unjust Enrichment Claim*

With respect to Lotus's unjust enrichment claim (Count II), Defendants argue that such a claim is barred where there is an available remedy at law and where Lotus "has not alleged that [it] conferred any benefit upon the Defendants." Mem. ISO Mot. for Summ. J. 23–25 [Doc. No. 36].

"A party with an adequate remedy at law cannot claim unjust enrichment." Shaulis v. Nordstrom, Inc., 865 F.3d 1, 16 (1st Cir. 2017) (applying Massachusetts law). Where an express contract exists, "Massachusetts law does not permit litigants 'to override [the contract] by arguing unjust enrichment.'" Id. (quoting Platten, 437 F.3d at 130).

Here, however, where Defendants have taken the position that they are not parties to the Lotus Security Agreement and that the MCA was a valid, enforceable contract under which Ming's—not New Ming—always owned the supermarket's inventory while the MCA was in effect, they cannot simultaneously assert that Lotus has an adequate remedy via enforcement of, or proceedings related to, the Lotus Security Agreement. Stated otherwise, Defendants may not claim continuous ownership of the supermarket's inventory while implying that Lotus's proper avenue for relief is to move against that same inventory under its contract with a party who, in

26

Defendants' view, could never lay claim to the inventory in the first instance. Thus, the court sees no bar to Lotus's assertion of an unjust enrichment claim against Defendants.

Unjust enrichment is "the retention of money or property of another against the fundamental principles of justice or equity and good conscience.'" Columbia Plaza Assocs. v. Northeastern Univ., 493 Mass. 570, 588–89, 227 N.E.3d 999, 1018 (2024) (quoting Sacks v. Dissinger, 488 Mass. 780, 789, 178 N.E.3d 388, 397 (2021)). An unjust enrichment claim has three elements: "(1) a benefit conferred upon the defendant by the plaintiffs; (2) an appreciation or knowledge by the defendant of the benefit; and (3) acceptance or retention by the defendant of the benefit under the circumstances would be inequitable without payment for its value." Tomasella v. Nestlé USA, Inc., 962 F.3d 60, 82 (1st Cir. 2020) (applying Massachusetts law) (quoting Mass. Eye & Ear Infirmary v. QLT Phototherapeutics, Inc., 552 F.3d 47, 57 (1st Cir. 2009)).

As to the first element, the court finds that Defendants have not sufficiently established the absence of a genuine dispute as to whether Lotus "conferred any benefit upon the Defendants." Mem. ISO Mot. for Summ. J. 24 [Doc. No. 36]. A reasonable jury, relying on the factual record before the court, could conclude that Go Fresh "received a measurable, nonspeculative benefit" from Lotus in the form of the supermarket inventory purchased by New Ming with funds provided pursuant to the Lotus CLA and Security Agreement, over which Ming's assumed control in April 2023. See Tody's Serv., Inc. v. Liberty Mut. Ins. Co., 496 Mass. 197, 201, 260 N.E.3d 309, 313 (2025) (defendant entitled to judgment as a matter of law on unjust enrichment claim where "the summary judgment record reveal[ed] no triable issue whether [defendant] received a measurable, nonspeculative benefit from [plaintiff]").

As indicated supra, a reasonable jury could find that, when Ming's took over the operations of the supermarket, it also took control of the supermarket's assets, including its inventory. The jury similarly could find that New Ming purchased that inventory as part of the store operations for which it was responsible under the MCA, and that the inventory was funded, at least in part, by the proceeds of the Lotus Loan, and intended as collateral for that Loan.

The value of the supermarket inventory over which Ming's took control is ostensibly "measurable[,]" see Tody's Serv., Inc., 496 Mass. at 201, 260 N.E.3d at 313, as a jury could credit New Ming's assertion in its Bankruptcy Schedules that Ming's "supervised the taking of" $700,000 of inventory. Sched. A/B ECF 51–52 [Doc. No. 38-3]. Drawing all reasonable inferences in Lotus's favor, the summary judgment record regarding Go Fresh's corporate structure is also sufficient for a jury to find that, insofar as Ming's retained the inventory without cost, any associated profit from the sale of the inventory ultimately benefited Go Fresh as Ming's parent company. See Receivership Sale Ord. 5 [Doc. No. 35-28]; Go Fresh Interrogs. ECF 4 [Doc. No. 38-1].

As to the second requirement for unjust enrichment, a reasonable jury could find that Go Fresh was aware of or had knowledge of, or should have been aware of or had knowledge of, the benefit insofar as (1) Lotus publicly filed a Form UCC-1 in October 2021, in which it listed the inventory as collateral for the Lotus Loan given to New Ming; and (2) Ming's, acting as a wholly owned subsidiary of Go Fresh, asserted control over that inventory in April 2023 when it retook the supermarket. See Tomasella, 962 F.3d at 82. Finally, the summary judgment record would permit a reasonable jury to infer that, where the jury could reasonably find that Lotus was divested of its collateral through Ming's actions and that Ming's likely profited from that

divestiture, the retention of the inventory would be inequitable absent some form of compensation. See id.

Accordingly, the court concludes that there exists a genuine dispute of material fact as to whether Go Fresh, via the supermarket inventory over which Ming's exerted control in April 2023, was unjustly enriched. Defendants' motion for summary judgment on Lotus's unjust enrichment claim is therefore DENIED.

## V.    Conclusion

For the foregoing reasons, Defendants' Motion for Summary Judgment [Doc. No. 32] is GRANTED as to Lotus's breach of contract claim (Count I) and as to Lotus's claims against Defendant Deng in his individual capacity. The Motion [Doc. No. 32] is DENIED as to Lotus's unjust enrichment claim (Count II) against Go Fresh 365, Inc.

IT IS SO ORDERED.

April 1, 2026                               /s/ Indira Talwani
                                            United States District Judge

29